**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No. 3:13-cv-505**

ROCKY SMITH,
HILTON GRADY SMITH, JR.,
TIMOTHY HARE,
CHAD PAXTON,
ALEX BETTS,
JAMES G. WILSON,
CHRISTOPHER CUDD,
FRANK LOPEZ,
FRANK BASINGER,
SHAWN BLANTON,
BRANDON STAMEY,
MARK J. WASSELL,
BRANDON BLEVINS,
JOHN MAROTTA,
JULIAN SWARINGEN, II,
ERIC MORALES and
TIMOTHY D. PARKER,

                Plaintiffs,

    v.

CITY OF CHARLOTTE,

                Defendant.

**SECOND AMENDED AND SUPPLEMENTED COMPLAINT**

      Plaintiffs, by and through counsel and pursuant to Rule 15(a)(2) and 15(d) of the Federal Rules

of Civil Procedure, hereby amend and supplement their Complaint with leave of the Court. Plaintiffs

seek equitable relief and damages and allege the following against Defendant:

1

## PARTIES AND VENUE

1.      Plaintiffs are citizens and residents of North Carolina and are employed by the City of Charlotte as sworn police officers at the Charlotte Douglas International Airport.

2.      Defendant City of Charlotte ("City") is a municipal corporation organized by charter under Chapter 160A of the North Carolina General Statutes   It maintains and operates, by a merger agreement reached in 1993 with Mecklenburg County, a police department known as the Charlotte-Mecklenburg Police Department ("CMPD") as one of its municipal functions.  It also maintains and operates the Charlotte Douglas International Airport ("Airport") as one of its municipal and/or proprietary functions.

3.      All actions of Defendant complained of herein were taken under color of law for purposes of 42 U.S.C. § 1983.   Further, all actions complained of were taken by or with the express approval of either the City Manager or the Chief of the CMPD, or both, and with notice to the City Council.  By law and by delegation by the City Council, those two individuals, acting in their official capacities, are final policymakers for Defendant for purposes of 42 U.S.C. § 1983, and any allegations against them in their official capacity are allegations against Defendant, which is considered a "person" subject to claims pursuant to 42 U.S.C. § 1983 for the violation of federal constitutional rights.

## JURISDICTION

4.      Defendant removed this case from state court under 28 U.S.C. §1441(a).  The District Court has jurisdiction over the subject matter under 28 U.S.C. §1331 and §1343(a)(4).

## FACTS

5.      All Plaintiffs are currently employed by Defendant as sworn, state-licensed, police officers, assigned to the Airport Division of the CMPD to provide police services at the Airport.

2

6.     Each Plaintiff also served in the same assignment as a sworn, state-licensed police officer employed by Defendant to provide police services at the airport prior to December 15, 2012, the date when Defendant formally consolidated the airport's then separate police force into the CMPD, creating the Airport Division.

7.     Both the airport and the CMPD are departments of Defendant, and Defendant is the ultimate employer of all persons who work in both departments.

7a.     The Airport, however, is financially separate from the City, with a stand-alone operating budget that relies on the Airport's commercial revenue.  Plaintiffs' salaries were paid out of that independent and separate budget.

8.     This formal consolidation came after years of CMPD involvement in the hiring, supervision and training of the Airport's police force.

9.     Plaintiffs were required to learn and adhere to all CMPD procedures with regard to their police work, in addition to learning and helping federal agencies implement Airport security protocols.

10.     Plaintiffs were required to participate in CMPD training on the use of firearms, Tasers and pepper or "OC" spray, the use of force policies and all other CMPD policies and procedures pertaining to police officers.

11.     Plaintiffs also had full authority to make arrests anywhere in the city and county and to use force as necessary.

12.     Defendant assigned a CMPD captain to supervise police services at the Airport in 2004.

13.     The CMPD captain assigned to the Airport evaluated and signed an annual review of each officer's work performance measured upon CMPD's performance standards.

14.     On information and belief, the captains that Defendant assigned to the Airport received full CMPD service credit for working as Plaintiffs' supervisors.

3

15.     At least two captains were promoted from the Airport to another CMPD post with rank of major.

16.     On information and belief, CMPD relied upon each such captain's record of service at the Airport to support the promotion.

17.     Since at least 2004, each Plaintiff has met and usually exceeded CMPD performance expectations in conducting his job as a police officer at the Airport.

18.     Each Plaintiff has been evaluated in a CMPD annual review since the consolidation and met or exceeded CMPD's performance expectations in every aspect of the job.

19.     Plaintiffs were hired by Defendant pursuant to CMPD hiring standards and protocols and went through the same process of background checks and physical and psychological testing as all CMPD officers.

20.     Each Plaintiff met or surpassed those hiring standards.

21.     The CMPD captain assigned to the Airport participated in the hiring process, along with a human resources employee of Defendant and a manager of the Airport, and had the power to reject any applicant who did not meet CMPD hiring standards.

22.     Before and after the consolidation, Defendant employed each Plaintiff as a sworn, state-licensed police officer, vested with the all of the powers and authority conferred by state law upon a police officer.

23.     Before and after the consolidation, Plaintiffs worked extensively with federal security officials at the Airport.

24.     Many of the Plaintiffs have received special federal training with regard to Airport policing and security standards.

25.     Some Plaintiffs have training certifications from federal agencies, including certification to train and lead others in implementing Airport security measures.

26.     For example, shortly after consolidation of the Airport police into a division of the CMPD, some of the Plaintiffs participated in a seizure of some $225,000 in cash at the Airport in cooperation with US Customs.

27.     Every officer involved directly in that seizure had been an Airport officer prior to the consolidation and had been cross-trained by Homeland Security and U.S. Customs.

28.     Other Plaintiffs have gone through extensive training to become explosives detection officers, teamed with a trained canine through a certification process that includes a four-month federal course and a year of field training with the canine.

29.     The CMPD only has one other officer so-trained and certified.

30.     Other Plaintiffs are trained to work with explosives without a canine and have been members of the CMPDs' bomb squad for many years.

31.     The CMPD frequently calls upon these specially trained and certified officers to conduct bomb or explosive sweeps off the Airport property, including bomb threats at schools and other locations.

32.     At the City Council's meeting of November 12, 2012, the City Manager discussed his decision, announced the week before, to consolidate the airport's police force into a new Airport Division under "full operational control" of the CMPD as of December 15, 2012.

32a.     The Council did not vote on the decision, but accepted it as the Manager's to make and asked questions about how this new CMPD division would operate.

33.     The City Manager asked a Deputy Chief of the CMPD to explain the background to the decision to give CMPD full operational control of policing at the airport.

33a.     The Deputy Chief explained that the airport maintained operational control of the airport's police force, though CMPD managed and supervised the airport officers.   CMPD had recommended and supported "100%" the decision that it take "operational control" from the airport management to create a "seamless" public safety operation at the airport.

34.     The City Manager's decision came two years after the controversial death of a Charlotte teenager whose badly mangled body was found in Massachusetts.

35.     A CMPD investigation into the teen's death, undertaken at the request of the Airport's director, reportedly concluded in February 2011 that the young man had gained access to the tarmac at the Airport, climbed into the wheel well of a US Airways jet bound for Boston and fallen to the ground from a great height when the landing gear opened on the plane's approach to landing in Massachusetts.

36.     On information and belief, the study did not fault the training or skill of the Airport officers, but recommended that some 18-20 additional police officers be assigned to the 41 already employed at the Airport, and that additional equipment be purchased, to bolster perimeter security and that CMPD take full control of non-federal police functions at the Airport.

37.     According to a memo published in the media, the Airport director wrote to the CMPD in February 2011 expressing strong disagreement with the conclusions of the investigation, saying they were unsupported factually and declaring that the CMPD had reached beyond its "ken" in its critique of the Airport's security.

38.     From the February 2011 CMPD report and the directors acid rejection of it, until the City Manager's November 2012  decision for CMPD to take full control of all airport policing, there was much public debate and rancor and, on information and belief, much internal discussion, about fully merging the Airport's sworn officers into the CMPD.

6

38a.    In June 2011, over the airport director's objection, the Council approved a budget that added some 17 CMPD officers to the airport.   Those positions would be paid from airport revenues, which greatly upset the airport director, so the positions were still not filled when the City Manager met with the Council on November 12, 2012.

38b.    The airport director was conspicuously absent from the November 12, 2012 Council meeting and was not mentioned by anyone in the discussions about CMPD taking full operational control of the airport's police force.

38.c    The City Manager explained that 17 officers would be added to the 41 officers in the airport police.   The new salaries had been budgeted in June 2011, but would be paid from airport revenue.

38d.    The City Manager told the Council that he had not discussed his decision with any of the airlines because the additional cost was not significant in the overall airport budget.

38e.    In response to a question about training the airport officers to conform to CMPD practices, the Deputy Chief of police explained that CMPD already managed and delivered the training of the 41 airport officers -- that operational control would give it authority to hire additional officers to work at the airport and to control policing throughout the airport.

38f.    In response to a follow up question, the Deputy Chief told the Council that the consolidation meant all the airport officers would be "under CMPD," that none of the airport officers would lose their jobs, and that the goal was to eventually allow them the opportunity to transfer to other divisions of CMPD like "all of our officers."

39.    Prior to the City Manager's decision to create a new CMPD Airport Division, the officers in the airport's police department were paid out of the Airport budget on Defendant's

7

"broadband" pay plan that applies to most of Defendant's departments and employees, including all CMPD employees with the rank of major and higher.

40.     The discussion with the Council showed that the officers would be paid out of the CMPD budget after the consolidation, but using airport revenues.

41.     CMPD pays its officers, sergeants and lieutenants on the Public Safety Plan, a different, step-based, pay plan that would pay Plaintiffs more salary than the "broadband" plan if they were paid, like other CMPD officers, based upon their rank, law enforcement experience, training and education.

42.     On information and belief, the internal planning discussions and the reports presented to the Council up through November 2012 about CMPD taking over policing at the Airport presumed that the airport's police officers would be paid post-consolidation as CMPD officers on the public safety plan.

43.     One example of the presumption that Plaintiffs would be merged into CMPD and paid on the CMPD salary schedule came from Defendant's public pronouncements about the budgetary impact of the change in supervision.

44.     Defendant's agents repeatedly stated to the public and the press that the plan for CMPD to take over Airport providing policing would more than double the annual cost of providing police services at the Airport to $5.5 million.

45.     Defendant invariably stated that one reason for this oft-repeated doubling of the budget was the cost of paying the Airport's officers on the CMPD salary schedule.

46.     Another example of the presumption that the Airport officers would be paid on the CMPD pay plan occurred in the summer of 2012, prior to the Council vote but during the discussions leading up to it, when the CMPD assigned a sergeant to the Airport as a step toward more complete supervision.

8

47.     As noted above, CMPD had assigned a captain to supervise the Airport police in 2004.

48.     CMPD also assigned a sergeant to the Airport in the summer of 2012, in a step toward complete supervision of police officers employed there.

49.     Plaintiffs Wilson and Parker were lieutenants in the Airport police force at that time, supervisors with extensive law enforcement experience, training and certifications.

50.     Defendant reduced their rank to sergeant as part of the assignment of the CMPD sergeant to the Airport.

51.     Wilson and Parker were informed that they were being reduced in rank to promote uniformity in the supervisory and salary structures.

52.     Another example of that presumption came from CMPD's Chief. He told the Airport police officers in late November, after the meeting with the Council, that they would be equal members of the CMPD and paid like every other officer.

53.     On or about November 30, 2012, the Chief met with the Airport officers to explain the upcoming consolidation and declared that the airport officers would become part of the CMPD "family" and be treated like all other CMPD officers, paid based upon their experience, training, education and rank.

53a.    Close to that same meeting, two CMPD airport captains met with the airport officers and reiterated that they would be treated as equals members of CMPD.

54.     In late November and early December, Defendant began the process of transferring the Airport officers' licensure paperwork to CMPD.

55.     The City submitted paperwork, called "F-5" forms, to the State licensing board appointing the Airport officers as "patrol officers" of the CMPD.

9

56.     Up to that time, Defendant had previously filed the F-5 forms to indicate the officers were appointed through the Airport as a distinct public agency.

57.     On December 14, the predecessor to the current City Manager issued a memo stating that all Airport law enforcement personnel would transfer from the Airport to the CMPD as of December 15, 2012.

58.     Consistent with the statements to the Council, Plaintiffs and the other airport officers were all sworn in as CMPD officers before the City Clerk in mid-December, and their names were given to and accepted by the City's civil service board as CMPD officers.

58a.     After the swearing in, the filing of new F-5 forms and the submission of their names to the civil service board, Plaintiffs were employed as CMPD officers subject to §4.61 of the City Charter, or Part I of the Code of Ordinances, and §§ 16.26 – 16.30, or Part II of the City's Code of Ordinances.   Those ordinances are attached as Exhibits A and B.

59.     Plaintiffs continued in the same, pre-consolidation work assignments at the airport, but now reported to work offsite at the new CMPD Airport Division office on Shopton Road.

61.     Plaintiffs drove from the CMPD Airport Division office to the airport work site in CMPD police vehicles now assigned to them.

62.     Plaintiffs also were now dispatched to CMPD calls off the Airport's property, both as primary responders and as backup to other CMPD officers from other divisions.

62a.     In the first month of consolidation. CMPD officials invited Plaintiffs to participate in the CMPD Pledge Fund, an arrangement where each CMPD officer contributes five dollars per pay period to a voluntary fund that, in turn, pays a cash gift to each CMPD officer upon retirement, or to a beneficiary upon a CMPD officer's in-service death.

Case 3:13-cv-00505-GCM   Document 33   Filed 06/12/14   Page 10 of 38

62b.    Many of the Plaintiffs enrolled in the CMPD Pledge Fund, which involves signing a binding contract to make a continuing contribution to the fund to receive the benefit.

62c.    In January 2013, Defendant chose by popular vote a uniform for all officers in the new Airport Division, with a unique sleeve patch or insignia for officers of the Division to wear -- both the legacy airport employees and legacy CMPD employees assigned there under the City Manager's plan.

62d.    In February, some of the Plaintiffs were informed that the new uniforms had been ordered and would arrive in four to six weeks; Defendant soon cancelled the uniform order after events involving the airport and its director took a dramatic turn.

63.    After the swearing in and acceptance on the civil service list as CMPD officers under § 4.61 of the City Charter, the Airport police officers were part of CMPD in every respect except for being moved to the public safety pay plan when the consolidation of the two police forces and its projected cost became part of a storm of controversy that engulfed the community over governance and ownership of the Airport.

64.    The airport director continually blasted Defendant's decision to turn airport policing completely over to the CMPD, calling it a "debacle" that would only increase airline landing fees to cover the increased costs without improving security.

65.    Defendant came under attack from many people over its budget projections about the increased cost of policing the Airport.

66.    Some accused Defendant of taking over airport policing to use airport revenues to make up for the loss of federal stimulus money which ended in 2012 and had been used to pay salaries.

67.    Defendant denied that allegation and, in an evolving public relations battle, and claimed that airport security had improved dramatically under CMPD control, citing increased arrest statistics in the first months after consolidation.

68.     Several suburban state legislators exploded a bomb on the City, introducing a bill to establish an independent regional airport authority that would take ownership of the airport away from Defendant and leave the airport director in charge.

69.     As that intense controversy roiled over whether Defendant would lose control of the Airport to the director and the new Airport Authority, Plaintiffs became unwitting pawns in the political and legal battle.

69a.    The City Council voted unanimously to file suit against the new airport authority. At every court proceeding in that lawsuit, the airport director appeared as the party representative of the new independent Airport authority.

69.b.   A controversy arose over whether the director resigned or was terminated by Defendant as airport director over this allegiance to the new airport authority.

69.c.   Defendant replaced the airport director with an interim director – a finance person who had been a City employee for years but had been assigned to the Airport about 18 months earlier.

69.d.   All of the long-time airport administrators whom the former director had hired were passed over for the interim position in favor of someone whose loyalty to the City in the ownership controversy was unquestioned.

69.e.   The interim director and City Manager then issued a report that criticized numerous decisions by the former director, a move widely criticized as a gratuitous personal attack.

70.     Defendant did an about face from prior statements about treating and paying the Airport officers as equals in the CMPD, and thus increasing security costs, and presented officers with a consolidation plan that now forced them to apply to join the CMPD and devalued completely their police service at the airport under the former director.

12

71.     First, the officers at the Airport now had to "apply" to CMPD as lateral hires in order to "join" CMPD and be placed on the public safety plan, even though the Airport officers already were sworn CMPD officers whose names had been accepted by the civil service board, and the CMPD submit their state F-5 license forms as CMPD patrol officers.

72.     Second, the airport officers' pre-consolidation law enforcement employment at the Airport did not "qualify" as police experience for lateral hiring purposes, both for eligibility for CMPD employment and for placement on the pay scale.

73.     An Airport officer had to have two years of law enforcement experience separate from the Airport to "qualify" for lateral entry.

74.     If an Airport officer's prior law enforcement experience was limited to the Airport police force, he or she had to apply to CMPD as a cadet and go back through the CMPD training academy for 24 weeks and then start as a new hire.

75.     This disqualification of Airport police experience in the lateral entry proposal applied regardless of the officer's documented performance, training record, number and type of certifications, or length of service at the airport.

76.     For example, Plaintiffs Wilson and Parker had been supervising lieutenants at the Airport for many years.  They had to surrender their rank and apply laterally as patrol officers if they wished to fully join CMPD.

77.     Plaintiff Hare, a canine explosives handler with over 15 years of experience at the Airport with specialized federal training in canine team explosives detection, and 22 years in the military before that, would have to surrender his canine for lack of "sniff time" to go through cadet training for four months and come in at the entry level in salary – costing the Airport one of its most

13

experienced explosives detection teams. Due to service related injuries, he could not complete that training at his age, though he can perform his current job.

78.     Plaintiffs Cudd (12 years' experience at the Airport), Blanton (8 years) and Wassell (6 years) and Wilson (over 20 years) had no other law enforcement experience but at the airport and, thus, had to complete basic training and start as cadets, even though each had met or exceeded CMPD performance expectations for a police officer in his annual review.

79.     Third, the consolidation plan did not recognize as qualifying experience the Police Training Officer (PTO) certification that several Plaintiffs had completed while working at the Airport.

80.     At least eight Airport officers had received PTO certification or its equivalent, Field Training Officer (FTO) certification while employed at the airport before consolidation.

81.     Seven of those officers received their PTO certification through the CMPD.

82.     The CMPD captain assigned to the Airport had selected each of those seven officers to participate in PTO training.

83.     Each of the officers attended CMPD's PTO training program with other CMPD officers and completed the same program.

84.     After they were PTO certified, the CMPD captain at the Airport then used those officers in the PTO capacity to train officers at the airport.

85.     The consolidation plan did not recognize that PTO training or service as a PTO officer for a CMPD captain as "qualifying" police work.

86.     Fifth, Defendant tried to claim that only those Airport officers who applied laterally and were accepted into the CMPD would be entitled to civil service protection, and then only after one year of lateral "employment" with CMPD.

14

87.     Those who did not apply laterally would remain employed by CMPD as police officers at the airport, with the same duties and authority as the "full" CMPD officers, but on a different pay plan and without civil service protection, regardless of the length of past or future service.

88.     This consolidation plan's announcement that the Airport officers had to apply to join CMPD contradicted City Manager and CMPD's representations to the City Council, the CMPD Chief's November statements to the airport officers, and the statements by the CMPD captains at the airport that these officers would be treated as equal members of CMPD upon consolidation.

89.     The plan surprised and dismayed Plaintiffs and the other Airport officers, as they had already been sworn as CMPD officers, and their names submitted to the civil service board under § 4.61 of the City Charter, and now had to take significant pay cuts if the wished to to "join" the CMPD or remain on the broadband plan at a far lower actual salary than they earned pre-consolidation, without civil service protection, but with the same responsibilities and assignments as "real" CMPD officers.

90.     This plan to maintain two different classes of sworn CMPD officers, devised in the vortex of the legislative attempt to take the Airport away from Defendant, was never presented to the City Council for a vote.  It tried to respond to two issues in the controversy – whether Defendant actually needed to take control of airport policing, and the higher cost of doing so.

91.     The declaration that the officers' prior employment did not "qualify" as law enforcement employment was targeted at damaging the Airport director's reputation for running the airport - a public relations effort to portray Plaintiffs and the other airport police officers as less competent and less professional than CMPD officers and thus justify CMPD's takeover of Airport policing from the Airport director.

92.     And the denial of any experience credit for work on the Airport police force forced Plaintiff's –the former director's employees – to bear the pain of Defendant's response to criticism that it was raiding the Airport budget and its effort to drive down the projected cost of merging the airport officers into the CMPD by not placing them on the public safety pay plan at their actual level of experience.

93.     Forcing the officers to come in at or near the bottom of the pay scale would save money for Defendant, devalued their experience and rebuffed public criticism that landing fees were rising because the CMPD took control of Airport policing.

94.     Illogically, CMPD claimed the Airport officers were not fully competent and professional and did not deserve equal pay to CMPD officers while it continued to employ them in the same police assignments the officers had held prior to the consolidation, and gave them CMPD performance ratings indicating that each of them exceeded CMPD expectations, and allowed Wilson and Parker to supervise the newly assigned legacy CMPD officers.

95.     On information and belief, no former Airport police officer applied to join the CMPD laterally under this initial consolidation plan.

96.     Every Airport officer was better off financially to remain on the broadband plan, even with the loss of considerable overtime with the change in work schedules.

97.     In March 2013, for administrative reasons, the former Airport officers were sworn by the Clerk as CMPD police officers a second time -- at the same time that Defendant was telling them they had to apply to join the CMPD.

98.     Since December 2012, CMPD had assigned off-duty and "call back" CMPD officers to the airport as part of its plan to increase overall police presence, but created a glaring salary disparity –

Case 3:13-cv-00505-GCM   Document 33   Filed 06/12/14   Page 16 of 38

two dramatically different pay rates for sworn CMPD officers working side by side performing the same duties.

99. On June 3, 2013, because no former airport officer had applied for lateral admission to CMPD, Defendant presented a revised consolidation plan. On information and belief, this plan also was not submitted to the City Council for approval.

100. The memo describing the new plan, called the Airport Incentive Entry Plan (AIEP), emphasized that the new AIEP was *not* the CMPD lateral program for officers applying from other agencies, but was a program solely for airport police officers "seeking to become CMPD officers."

101. Plaintiffs were already sworn CMPD officers.

102. Their names had been accepted by the civil service board as CMPD officers.

103. They had been licensed by the state as CMPD patrol officers on CMPD issued F-5s.

104. They reported to a CMPD division office each work day, each drove a CMPD-issued vehicle to the Airport for work and each reported to the CMPD chain of command.

105. Plaintiffs responded to calls off the Airport like other CMPD officers.

106. The new AIEP plan contained many of the same provisions as the prior plan.

107. Prior experience at the Airport did not qualify an officer to "join" the CMPD.

108. An officer had to have at least two years of law enforcement experience somewhere other than the Airport to be eligible to "join" CMPD outright.

109. Any officer without such minimum experience had to complete the 24-week basic training academy to "join" the CMPD, regardless of the position held, length of service, or record of performance at the Airport, impacting Hare, Cudd, Blanton, Wassell and Wilson, and requiring Hare to surrender his canine.

17

110. The AIEP still refused to recognize PTO certification for airport officers for pay purposes, declaring that the airport was not a training area, although all the "legacy" CMPD officers assigned to the airport after the consolidation had to be trained on the special policing issues and procedures at the airport.

111. In the thirteen months since the consolidation, each Plaintiff had been evaluated as a sworn CMPD officer by CMPD supervisors on CMPD's performance review document (PRD), and each had been rated as exceeding performance expectations.

112. Wilson and Parker have been evaluated as meeting or exceeding CMPD standards as Sergeants. And in that supervisory role CMPD has relied on them to evaluate the performance of legacy CMPD officers under their supervision. Yet they must relinquish their supervisor status if they wished to "join" CMPD.

113. Like the original plan, the AIEP required every former Airport officer to "join" the CMPD through the AIEP process and work for a year to be eligible for civil service protection. An officer who did not apply through the AIEP was not entitled to civil service protection.

114. A state Superior Court judge then declared that civil service provision unlawful, ruling in state court case number 2013 CV 12639 that an airport police officer hired in 2007 and now performing the same duties as a sworn CMPD officer was entitled to civil service protection.

114a. Regardless of the outcome of that legal proceeding, which Defendant appealed, all Plaintiffs now have civil service status as CMPD officers under § 4.61 of the City Charter, as each has worked over a year since his name was submitted to the civil service board.

115. The AIEP differed from the first plan, however, with respect to placement on the CMPD pay scale, but still did not treat the officers the same as other CMPD officers.

116. Stating that the "CMPD understands the value of supporting and caring for its employees," the AIEP promised that no officer would lose pay in "joining" the CMPD through the AIEP.

117. The AIEP places a participating officer in the CMPD pay plan at one step above their base pay on the broadband plan after completing the one-week orientation, and then an additional step after completing a four or five-week ride along training at another division.

118. The AIEP does not, however, pay Plaintiffs the same salary as CMPD officers of comparable rank, training, education and law enforcement experience.

119. The AIEP plan also did not take into account the fact that the officer's hours would be reduced on the CMPD schedule compared to the existing Airport officer's work schedule, so that many Airport officers would still lose money even if their base salary went up under the AIEP.

120. The AIEP does not begin to address the most glaring pay disparity – a $20,000 annual salary gap between the legacy CMPD sergeant assigned to the Airport and Plaintiffs Wilson and Parker. All three have virtually identical years of experience and Wilson and Parker have advanced certifications specifically relevant to Airport policing.

121. Plaintiff Wilson, received CMPD certification and training to become a Sergeant but also completed a specialized federal certification course to be an airport law enforcement officer trainer (LEOT) and has played a key role in training all officers at the airport, including the CMPD employees newly assigned to the Airport Division since the consolidation.

122. Plaintiff Parker is a certified bomb technician and has been a member of the CMPD bomb squad for years, participating in bomb squad training and responses off the Airport. He has numerous certifications from advanced courses in airport related matters, including bomb detection

19

and terror response and WMD response.  Like Wilson, he has been instrumental in training all officers at the airport, including the CMPD employees assigned to the airport division since the consolidation.

123.    Under the AIEP, Parker and Wilson still would lose supervisory rank, come into the CMPD pay plan as patrol officers and remain even farther behind their similarly situation CMPD sergeant in terms of pay.

124.    Plaintiffs Grady Smith, Paxton, Hare and Betts each completed a four-month specialized canine explosive detection training course with the Transportation Safety Administration followed by a year-long period working with their respective dogs at the Airport to become certified in explosives detection.

125.    CMPD has only one other officer trained in explosives detection, so CMPD calls these Plaintiffs to assist with responses to bomb threats outside the Airport.

126.    Under the AIEP, the Airport officers would be paid on a different salary schedule than this other CMPD explosives detection officer, not receiving full experience credit for the identical, highly trained level of police work as that other CMPD officer.

127.    Plaintiffs Betts and Swaringen have received additional training to become certified as trainers of canine explosive detection teams.  They coordinate and run training events for canine explosive detection handlers over a wide region, training officers from police departments in North and South Carolina and have led trainings and sweeps for large scale events at locations like the Lowes Motor Speedway and the Panthers stadium.  Betts was selected to an elite team to sweep the stadium for the 2013 Superbowl in New Orleans.

128.    Betts and Swaringen do not receive full experience credit for this highly trained level of police work under the AIEP.

129.    Plaintiffs Rocky Smith, Grady Smith, Paxton, Wilson, Parker, and Lopez have all attained Advanced Law Enforcement Certification through the state's Education and Training Standards Commission, the highest level of certification a police officer in North Carolina can attain. It reflects a combination of the length of service as a police officer and completion of more than 2,000 hours of documented training.

130.    Under the AIEP, these Plaintiffs do not receive full experience credit for this state-certified level of police work, but are paid less salary than CMPD officers with less experience and training who do not qualify for the advanced certification.

131.    Plaintiffs objected to the AIEP verbally and in writing, complaining that they were being treated as sworn CMPD officers in every respect except salary, including being dispatched to calls off the Airport property.

132.    Defendant and the CMPD responded to Plaintiffs' concerns about the unfairness of the AIEP salary plan by issuing a directive that no officers assigned to the Airport would be dispatched or respond to any calls off the Airport property.

133.    This new dispatch rule revoked the practice in place since consolidation and led to absurd results, with Plaintiffs and dispatchers having to determine if a call incident had occurred on the airport side of a street bounding the airport's property -- to which Plaintiffs *must* respond -- or on the other side of such a street -- to which Plaintiffs *must not* respond.

134.    Shortly before the filing of this lawsuit, however, CMPD dispatched legacy airport officers to respond to a robbery call at an apartment complex near the airport but outside its boundaries, acting in the full role of CMPD officers, entering the property to respond and investigate and filing all necessary police reports.

21

135.    In voicing concerns about the unfairness of these two consolidation plans, Plaintiffs have been told that they are risking their jobs and decertification as sworn law enforcement officers if they did not "apply" to CMPD.

136.    Defendant has asserted that the AIEP process is necessary for liability purposes.

137.    Several Airport officers have applied to the AIEP and participated in the training.

138.    From their descriptions of the training class, Plaintiffs had been trained already on every topic covered in the course.

139.    Plaintiffs have no objection to participating in a 25-hour refresher course or a five-week ride along course as part of the consolidation.

140.    But every Plaintiff has been required by their CMPD captain to participate fully in every CMPD training module introduced since they have been police officers at the Airport.

141.    Plaintiffs have been trained and required since 2001 to use the CMPD's incident reporting system, KBCOPS; to participate in an orientation program called Cityview; and to use the policy and procedure system for CMPD officers called Plateau that provides regular updates on local and state law enforcement policies, to participate in CMPD training on the use of firearms, Tasers and pepper spray, to follow the CMPD use of force policies and all other CMPD policies and procedures pertaining to police officers.

142.    And there is no distinction in the job responsibilities of those legacy airport officers who have participated in the AIEP and those who have not.

143.    As for the liability concern, on information and belief, one officer applied for the AIEP and was rejected because of a record of an automobile accident at a prior law enforcement agency.

Case 3:13-cv-00505-GCM   Document 33   Filed 06/12/14   Page 22 of 38

144.    But that employee continues to report to work every day at the Shopton Road division office and, like every other officer, continues to drive a CMPD police vehicle for his work at the Airport and possesses full police powers.

145.    The AIEP process has created three-tiers of pay for police officers, all of whom are performing the exact same duties and have the same responsibilities at the Airport: legacy CMPD officers with the least Airport experience but the highest pay, legacy Airport officers who complete the AIEP and have accepted second-class status, and legacy Airport officers who have not completed the AIEP and have the lowest pay.

146.    Defendant informed Plaintiffs that they had to apply to "join" the CMPD through the AIEP by September 3, 2013 or lose the opportunity to "become" a CMPD officer.

147.    Since filing this original Complaint, Defendant has put the airport officers under additional scrutiny.   Plaintiff Parker was formally written up after the lawsuit was filed over a matter that occurred a month earlier and had not warranted discipline before the lawsuit was filed.

148.    Other officers have experienced similar scrutiny and minor matters are being written up in retaliation for challenging the constitutionality of the pay plan.

149.    Defendant filed it Answer to Plaintiffs Complaint in September 2013 and to the First Amended Complaint on October 27, 2013.

150.    Unknown to Plaintiffs, City staff had informed the Council in October 2013 that it was sending out for bid a request for proposals for a consultant to study "best practices" for airport security.

151.    On information and belief, the City received no response to its request for proposals. So it prepared a self-serving study finding that the Plaintiffs  should be converted to unsworn security guards.

152.    After Defendant briefed its Motion for Judgment on the Pleadings in this action, Plaintiffs were ordered to attend a mandatory meeting on January 15, 2014.  As warned over the prior several months, Plaintiffs were informed that they will losing their jobs and their law enforcement powers as of March 28.

153.    The interim director and other aviation managers informed Plaintiffs (and the few other legacy airport officers who have not yet enrolled in or have been rejected from the AIEP) that they all will be reclassified as security guards as of March 28, 2014 and must surrender their police badge and service weapon on that date, without recourse to a civil service hearings.

154.    No other CMPD officers were called into the meeting, and no other officers assigned to the airport will be demoted.  Additional CMPD officers will be assigned to the Airport Division in March to replace Plaintiffs.

155.    The interim director and other managers explained that Defendant has decided to move to a hybrid corporate security plan with unsworn security guards, employed by the airport rather than CMPD, working in conjunction with CMPD officers.  Plaintiffs will be the first of these new, unsworn security guards and their former police positions will be filled, not eliminated.

156.    The airport managers could not explain why Plaintiffs would not remain employed as sworn CMPD officers to supervise the new unsworn security guards, rather than be replaced by a new phalanx of CMPD officers who will have to be trained in airport policing issues.

157.    The rationale offered for the reassignment – to improve passenger safety -- is a pretext. Management did not identify any particular safety concern that would be addressed or improved by demoting Plaintiffs.

158.    Instead, 14 months after telling the Council that it was necessary for CMPD to have full operational control of all aspects of policing at the airport for a seamless police presence, the City

claims it much return to a split-employment security model that strips Plaintiffs of their law enforcement status and makes them civilian airport employees.

159.   The move will have at least one immediate negative impact on airport policing, as three Plaintiffs are part of a group of five CMPD officers cross-designated as federal customs agents and involved in about $500,000 in money seizures in the last year.  Those three Plaintiffs must surrender that status, as only sworn law enforcement officers can be cross-designated.

160.   It will take months for three new officers to complete Homeland Security training for cross-designation.

161.   The interim director disclosed the motive for this reassignment in the meeting, launching into criticism of the former airport director, ridiculing him for referring to Charlotte-Douglas as "my airport" and attempting to exercise total control over the facility.  In contrast, the interim manager boasted that the airport management now cooperated fully with the City and CMPD.

162.   The aviation managers announced certain measures to delay the full economic and professional impact of the demotion for up to one year in an effort to blunt a legal challenge to the reorganization.

163.   Those measures include holding Plaintiff's F-5s until March 2015, keeping law enforcement retirement contributions in place for that one year and promising salary increases.

164.   But the Plaintiffs will lose civil service protection in their employment as well all professional standing, power and authority as police officers.  They will also suffer significant economic consequences in a year, if not sooner.

165.   Within a year from March 28, 2014, Plaintiff will lose eligibility for the special supplementary law enforcement separation allowance to age 62 under N.C.G.S. §143-166.42.   That supplemental retirement benefit is available to age 62 for an officer with 30 years of service.  By

25

statutory formula, the benefit is calculated by multiplying the retiring officer's final salary by .0085 and then multiplying by the officer's years of service. Thus, an officer earning $50,000 per year who retires at age 50 with 30 years of service would receive $12,750 annually in a retirement supplement until age 62 in addition to his or her full retirement benefit. Plaintiffs are all vested in that benefit and will lose eligibility to participate as civilian employees.

166. In their unsworn positions, Plaintiffs also will lose the higher contribution rate of 7.28% of salary that Defendant pays the state retirement system on behalf of its law enforcement employees, the higher 401k contribution rate of 5% that Defendant pays to its law enforcement officers compared to 3% for general employees, and the separation/death benefit from the CMPD Pledge Fund, which is currently about $11,000.

167. Plaintiffs will also lose their law enforcement licenses in 2016 if they remain employed as unsworn civilian security guards, but aviation management offered at the meeting that each Plaintiff could still "apply" to "join" CMPD under the terms of the AIEP that are challenged in this lawsuit; but that any such applications would be considered only on a case by case basis.

168. At least one Plaintiff has been pressured individually not to apply, despite an excellent record as an airport officer and a strong CMPD evaluation this year.

169. The Plaintiffs employed as federally-certified canine explosive detection handlers were told they must lose their dogs and surrender their positions if they wish to "join" CMPD. They can only be patrol officers. And Wilson and Parker still must surrender their supervisory rank to "join" CMPD as patrol officers and keep their law enforcement status.

170. Management stated that Plaintiff have no civil service protection from this personnel action because it involves a reclassification. But each officer will be replaced at the airport by a CMPD officer upon demotion to security guard as the plan was described at the meeting.

26

171.   Defendant's actions represent a complete repudiation of the promise made to Plaintiffs in November and December 2012 that they would receive equal treatment as police officers under the consolidation, and City Manager's and CMPD Chief's assurance to the Council in November 2012 that no Plaintiff would lose his job as a police officer in the creation of the Airport Division.

## FIRST CLAIM FOR RELIEF
### (Equal Protection)

172.   All prior paragraphs are incorporated by reference.

173.   Defendant's actions complained of herein have been taken in irrational retribution for the attempt of the former airport director to wrest control and ownership of the airport from the City. Defendant irrationally connects Plaintiffs to these actions of their former boss, as shown by the pejorative comments about the former director at the January 15, 2014 meeting.  The negative association that Defendant makes between the former director and Plaintiffs is completely irrational and serves no legitimate governmental purpose.

174.   Defendant's new plan to divest Plaintiffs of their police status and replace them with other sworn officers is the culmination of that antipathy towards Plaintiffs that has fueled this pattern of unequal treatment.

175.   Defendant's action to divest Plaintiffs of their law enforcement powers, the economic benefits associated with that status, and the civil service protection afforded by the City Charter, was also taken in retaliation for Plaintiffs' asserting their right to equal protection as police officers through filing this lawsuit.

176.   Defendant's enmity toward Plaintiffs as a group of employees for their connection to the former director and for filing this lawsuit does not serve any legitimate governmental interest.

177.   Apart from that animus, Defendant's refusal to treat Plaintiffs the same as other, similarly situated, sworn CMPD officers assigned identical duties at the airport is irrational, arbitrary

27

and capricious, and serves no legitimate governmental purpose. Even before the announcement that they were losing their police positions, Defendants had denied Plaintiffs equal protection of the law by:

a.  Creating a three-tiered pay scale for Airport Division officer employed in the exact same positions;

b.  Requiring Plaintiffs to "apply" to "join" the CMPD after they were already sworn and employed at CMPD officers pursuant to §§ 16.26 – 16.30 of the City Ordinances and their names were accepted by the civil service board as CMPD officers under § 4.61 of the City Ordinances; including requiring them to "apply" for the positions they already held in the Airport Division and had met or exceeded CMPD expectations in performing;

c.  Denying Plaintiffs experience credit for documented performance in the police positions they had held for years, pursuant to a state law enforcement license, for purposes of "qualifying" for CMPD employment and for placement on the public safety pay plan, even for experience gained after the consolidation;

d.  Requiring those Plaintiffs lacking two years of law enforcement experience at some police agency other than the airport to go through basic training at the CMPD Academy and "join" CMPD as a cadet;

e.  Denying Plaintiffs the PTO certification status they earned from CMPD and the financial benefits paid to other CMPD officers with that certification;

f.  Forcing Plaintiffs Wilson and Parker to surrender their supervisory status if they wish to "join" the CMPD.

178.  Then Defendant announced that all Plaintiffs will lose their law enforcement status by March 28, 2014 and become security guards and then be replaced by other CMPD officers;

179.     Apart from the retaliatory antipathy for Plaintiffs manifest in that decision, the reclassification is irrational in that it does not enhance airport security, the proffered justification for the move.

180.     Plaintiffs bring this claim pursuant to 42 U.S.C. §1983 for violation of their right to equal protection guaranteed by the Fourteenth Amendment of the United States Constitution.   All actions of Defendant complained of herein were taken under color of law for purposes of 42 U.S.C. §1983.

181.     Plaintiffs seek declarations that Defendant has denied them equal protection, first, in its failure to treat them in the same manner as other sworn CMPD officers assigned the same duties and responsibilities in the Airport Division and, second, in reclassifying Plaintiffs as unsworn security guards.

182.     Plaintiffs seek an injunction ordering Defendant to grant Plaintiffs equal treatment in pay, benefits and status as sworn officers of the CMPD.

183.     Plaintiffs also seek an injunction prohibiting Defendant from retaliating further against Plaintiffs for bringing this action, and enjoining the reclassification of Plaintiffs as unsworn security guards no longer employed by CMPD.

184.     Plaintiffs seek and are entitled to lost wages in the amount they would have received from proper placement and equal treatment on the public safety pay plan from December 15, 2012 to the present.

185.     Plaintiffs seek and are entitled to compensatory damages for the distress and anxiety created by this denial of their rights to equal protection.

186.     Plaintiffs also seek costs and attorneys' fees under 42 U.S.C. § 1988.

**SECOND CLAIM FOR RELIEF**
**(Procedural Due Process)**

187.     All prior paragraphs are incorporated by reference.

188.     Plaintiffs have been employed as sworn CMPD officer for more than 12 months after their names were submitted to the civil service board as sworn CMPD employees.  Thus, Plaintiffs have civil service protection under §4.61 of the City Charter

189.     Under § 4.61 of the City Charter, Defendant cannot dismiss or demote any Plaintiff from his law enforcement position, or relieve him of his duties, without providing notice of specific charges and a hearing before the civil service board on those charges.

190.     This civil service protection from dismissal or demotion creates a continued expectation of employment that is recognized as a property right under the Due Process clause of the Fourteenth Amendment.

191.     Defendant's managers declared at the January 15, 2014 meeting that Plaintiffs are not entitled to civil service hearings over their reclassification as security guards, even though they will lose all civil service protections in further employment.

192.     Plaintiffs' property rights to continued employment as law enforcement officers includes the right to receive significant economic benefits apart from their base salary, such as any vested entitlement to the special separation allowance provided by N.C.G.S. § 143-166.42, the 401k contribution of 5% that Defendant makes for its law enforcement officers, the retirement contribution of 7.28% of salary that Defendant pays into the State retirement plan for law enforcement officers, and the benefits of the CMPD Pledge Fund.

193.     Defendant's decision to divest Plaintiffs of their police officer status and civil service protection by reclassifying them as security guards is a demotion that involves concrete economic loss for Plaintiffs, even if they remain employed as guards and do not suffer loss of employment or base salary, and even if these other economic losses are phased in over a year.

30

194. The Plaintiffs cannot be demoted without notice of charges and a civil service hearing under § 4.61(u). They cannot be relieved of their duties without notice of charges and an automatic hearing under § 4.61(h). Doing so violates their right to due process.

195. Even if the transfer did not involve tangible economic loss, it would still violate Plaintiffs' right to procedural due process to lose their police status and civil service protection of their employment where only a small group of employees are impacted and other employees will immediately fill the protected positions they are losing.

196. The reclassification is a sham directed at depriving Plaintiffs of their property interest in their employment and their right to due process.

197. The enmity toward Plaintiffs as a group that motivates this reclassification does not represent and can never represent a legitimate governmental interests or promote a legitimate public purpose.

198. Plaintiffs ask this Court to enjoin their reclassification as security guards without notice of charges and the right to individual hearings as a violation of their right to procedural due process

199. Plaintiffs also seek and are entitled to compensatory damages for the humiliation, distress and anxiety created by this denial of their rights to procedural due process.

200. Plaintiffs also seek costs and attorneys' fees under 42 U.S.C. § 1988.

## THIRD CAUSE OF ACTION
### (Substantive Due Process)

201. All prior paragraphs are incorporated by reference.

202. Defendant has conferred civil service protection upon Plaintiffs under §4.61 of the City Charter.

203. That civil service protection from dismissal or demotion creates an expectation of continued employment that is considered a substantive property right under the Due Process clause of

31

the Fourteenth Amendment.

204.    The reclassification of Plaintiffs as security guards with no civil service protection of their employment abrogates their due process rights.  If Defendant decides to terminate any Plaintiff after March 18, 2014, that Plaintiff will have no civil service protection or due process rights.

205.    The reclassification of Plaintiffs' positions only to immediately replace them with other officers is not a broad reorganization to further a legitimate public purpose, but a punitive action, *ultra vires* under state law, that targets Plaintiffs over the actions of the prior airport director, for questioning the denial of equal protection since formation of the Airport Division, and for filing this lawsuit to seek enforcement of their rights.

206.    Defendant's brazen action to strip Plaintiffs of civil service protection and destroy their law enforcement careers is deliberate, retaliatory, irrational, and arbitrary conduct that does not serve any legitimate governmental interest and shocks the conscience.

207.    Plaintiffs seek to enjoin the reclassification of their positions as a violation of their right to substantive due process.

208.    Plaintiffs also seek compensatory damages for the humiliation, distress and anxiety caused by this violation of their right to substantive due process.

209.    Plaintiffs also seek costs and attorneys' fees under 42 U.S.C. § 1988.

**FOURTH CAUSE OF ACTION**
**(Request for Declaratory Judgment)**

210.    All prior paragraphs are incorporated by reference.

211.    N.C.G.S. § 1-254 provides as follows:

> Any person . . .  whose rights, status or other legal relations are affected by a . . . statute (or) municipal ordinance . . . may have determined any question of construction or validity arising under the . . .statute (or) ordinance, . . . and obtain a declaration of rights, status, or other legal relations thereunder.

32

212.     Defendant is a municipal corporation whose powers are limited to those expressly and impliedly conferred by the Legislature, including any supplementary powers under N.C.G.S. § 160A-4 necessary and reasonable toward carrying out its enumerated powers.

213.     Under Chapter 16, Article II, Division I of the Charlotte City Ordinances, the City operates a *single* police department, under control of the Chief, whose members are appointed by the City Manager from the register prepared by the Civil Service Board.

214.     Under § 16-29 of the Code of Ordinances, police officers appointed to that single police department under Chapters 16 are "entitled to such pay and allowances as may be from time to time be fixed by the council."

215.     Defendant swore in Plaintiffs in December 2012 as CMPD officers under Chapter 16, Article II, Division I of the Charlotte City Ordinances.

216.     Plaintiffs names were placed on the civil service register on or about December 15, 2012.

217.     Thus, under the City Ordinance, Plaintiffs were appointed to the City's police department on or about December 15, 2012.

218.     The City Council has never voted on or "fixed" any separate pay plan for Plaintiffs as sworn CMPD officers in the Airport Division.    The only pay plan the Council has approved for CMPD officers is the public safety plan.

219.     Once the City Manager appointed Plaintiffs as "members" of CMPD pursuant to §16.29, Defendant lacked any legal basis under Chapter 16 to treat Plaintiffs as non-members and require them to "apply" to "join" CMPD.

220.     The City Manager and CMPD's imposition of a separate pay plan for Plaintiff as non-members of CMPD from December 15, 2012 to the present, including its creation of the AIEP to

33

confer membership, was *ultra vires* and not based on any lawful authority.

221.    Plaintiffs seek a declaratory judgment pursuant to N.C.G.S. § 1-254 of their legal right to participate in the public safety pay plan as full members of CMPD's Airport Division, and that maintenance of a separate pay plan for Plaintiffs as less than full members of is an *ultra vires* act.

222.    Defendant also conferred civil service protection upon Plaintiffs as sworn CMPD officers under § 4.61 of the City Code of Ordinances.  That protection was conferred after  Plaintiffs served 12 months in the Airport Division, if not immediately upon employment there, as opined by the state superior court.

223.    There are no provisions in the City Charter or its Ordinances that authorize the removal/demotion of Plaintiffs from their positions as sworn CMPD police officers pursuant to a reclassification or transfer, thus the announced staffing changes is also *ultra vires.*

224.    § 4.61(h) provides that Plaintiffs *cannot* be removed from their duties except upon written notice of some violation of police duties and an "automatic" hearing before the civil service board.

225.    Defendant does not claim that Plaintiffs are being reclassified for any violations of duty nor offered them a hearing.

226.    § 4.61(u) provides that Plaintiffs *cannot* be demoted except "after written charges are preferred and a hearing held before the Civil Service Board."

227.    Defendant has not "preferred" any written charges against Plaintiffs or offered them a hearing.

228.    There is no other provision in the City Charter and Code of Ordinances that authorizes Defendant to reclassify or transfer Plaintiffs out of civil service protection as police officers.

229.    Even if Defendant retains supplemental authority under N.C.G.S. § 160A-4 to eliminate

protected police positions due to a legitimate exigency like a decrease in City funds, Defendant has not claimed any such exigency.

230.    Defendant has only proposed reclassifying Plaintiffs and then replacing them with other police officers immediately.

231.    The decision to demote Plaintiffs from protected, sworn police officers to unprotected, unsworn security guards exceeds Defendant's lawful authority under the City Charter and is thus *ultra vires*.

232.    Such action makes a mockery of the City Charter and the rule of law.

233.    Plaintiffs seek a declaration that Defendant lacks legal authority under the City Charter and Ordinances to divest Plaintiffs of their civil service protection as sworn CMPD police officers through this reclassification.

234.    Plaintiffs also seek the costs allowed for bringing this action.

## FIFTH CAUSE OF ACTION
### (Impairment of Contracts)

235.    All prior paragraphs are incorporated by reference.

236.    Article I, Section 10, Clause 1 of the United States Constitution states, "No State shall ... pass any ... Law impairing the Obligation of Contracts...." This prohibition is applicable to municipalities.

237.    The action of Defendant in stripping Plaintiffs of their law enforcement powers and status constitutes a substantial, unreasonable and unnecessary impairment of contracts, including:

  a.  continued service credit for Plaintiff Hare's vested interest in the special separation allowance available only to law enforcement officers under N.C.G.S. §143-166.42;

  b.  loss of the contractual benefits of the CMPD Pledge Fund.

238.    These contractual impairments are substantial and are not reasonable or necessary.

35

239. Defendant has not impaired these contracts to further a public purpose, but only to punish Plaintiffs for the actions of the former airport director, for their questioning their unequal treatment since being sworn as CMPD officers in the new Airport Division, and for filing this law suit to assert their right to equal protection.

240. Plaintiff asks the Court to enjoin Defendant from reclassifying them as unsworn security guards, and thereby impairing these contractual rights that attach to their law enforcement status.

241. Plaintiffs also seek actual damages to compensate them for any economic loss suffered as a result of the threatened action if it is not enjoined.

## JURY DEMAND

242. Plaintiff's demand a trial by jury, but seek a judicial declaration of their rights under N.C.G.S. § 1-254 and to injunctive relief from the Court in the manner requested.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for a judicial declaration of their rights under N.C.G.S. § 1-254 and for injunctive relief from the Court in the manner demand judgment in their favor, and, upon the trial of this matter, and for the following relief from the Court:

1. A declaratory judgment under N.C.G.S. § 1-254 that Defendant lack legal authority under the City Charter and Ordinances to compensate Plaintiffs differently than the other sworn CMPD officers employed in the Airport Division.

2. A declaratory judgment under N.C.G.S. § 1-254 that Defendant lacks legal authority under the City Charter and Ordinances to abrogate Plaintiff's civil service protection as sworn CMPD officers by reclassifying them as unsworn, civilian security guards.

3. A declaration that Defendant's failure to pay Plaintiffs under the same pay plan as other

36

sworn CMPD officers performing the same duties in the Airport Division violates Plaintiff's right to equal protection and is unconstitutional;

4.      A declaration that Defendant's reclassification of Plaintiffs from sworn police officers to unsworn security guards violated Plaintiffs' right to equal protection and is unconstitutional;

5.      A declaration that Defendant's reclassification of Plaintiffs from sworn police officers unsworn security guards violates Plaintiff's right to procedural due process and is unconstitutional;

6.      A declaration that Defendant's reclassification of Plaintiffs from sworn police officers unsworn security guards violates substantive due process and is unconstitutional;

7.      A declaration that Defendant's decision to reclassify Plaintiffs as unsworn security guards amounts to an unconstitutional impairment of contracts that are tied to Plaintiffs' status as law enforcement officers.

8.      An injunction ordering Defendant to place Plaintiffs' on the public safety plan and treat them as fully equal police officers with full credit for their police service at the airport;

9.      An injunction protecting Plaintiffs' civil service status as licensed and sworn CMPD law enforcement officers and enjoins the announced plan to reclassify them as unsworn security guards as *ultra vires* under state law and as a denial of equal protection, a violation of procedural and substantive due process, and as an unconstitutional impairment of contracts.

10.      An injunction that prohibits any retaliatory action toward Plaintiffs by Defendant;

11.      An award of lost wages in the amount Plaintiffs would have received with proper placement on the public safety pay plan from December 15, 2012 until such time that they are placed on that plan;

12.      An award of any other actual damages Plaintiffs may have suffered or will suffer in the future from the violation of their constitutional rights.

13.    An award of compensatory damages for the distress and anxiety created by the denial of Plaintiffs' constitutional rights.

14.    The costs and expenses in this action, including reasonable attorneys' fees under 42 U.S.C. §1988; and,

15.    Such other and further relief as the Court deems just and necessary.

This the 12th day of June, 2014.

s/ S. Luke Largess
S. Luke Largess (N.C. Bar #17486)
TIN FULTON WALKER & OWEN, PLLC
301 E. Park Avenue
Charlotte, North Carolina  28203
(704)338-1220
*llargess@tinfulton.com*
Attorney for the Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Proposed Second Amended and Supplemented Complaint has been served on counsel of record via ECF to:

Mark H. Newbold
Police Attorney's Office
601 East Trade St.
Charlotte, NC  28203
mnewbold@cmpd.org

This the 12th day of June, 2014.

s/ S. Luke Largess
S. Luke Largess
Attorney for the Plaintiffs

38